**Iraj LAVIAN, Plaintiff,**

v.

**Shahram HAGHNAZARI and Hagh Prescription Headquarters, Inc., Defendants.**

No. 93–CV–1215 (JS).

United States District Court, E.D. New York.

March 31, 1995.

Bobrow Greenapple Skolnik & Shakarchy, P.C. by Lawrence Greenapple, New York City, for plaintiff.

Herbert Monte Levy, New York City, for defendants.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

In the instant case, plaintiff Iraj Lavian sues his nephew Shahram Haghnazari [hereinafter "Sam"] asserting a number of causes of action, both federal and state, in connection with a purported scheme whereby Sam fraudulently induced his uncle to invest substantial sums of money, and considerable time and labor, in a closely-held corporation named Hagh Prescription Headquarters, Inc. [hereinafter "HAGH"], only to be told by his nephew, more than two years after the initial investment, that he had no interest therein. Federal question jurisdiction is asserted under the Securities Exchange Act of 1934, as amended, The Fair Labor Standards Act [FLSA], and the Racketeer Influenced and Corrupt Organizations Act [RICO].

Pending before the Court are the defendants' motion to dismiss the amended complaint, and the plaintiff's cross-motion to add HAGH as a defendant to this action. In their motion to dismiss, the defendants assail plaintiff's federal causes of action, both substantively and for failure to plead fraud with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, and fur-ther contend that the dismissal of these federal claims leaves the Court without subject matter jurisdiction to adjudicate plaintiff's common-law fraud and breach-of-contract claims. The defendants further direct the Court's attention to an earlier proceeding in this action before Judge Amon, on December 3, 1993, wherein plaintiff's original complaint was dismissed without prejudice to replead pursuant to Fed.R.Civ.P. 9(b). The defendants argue that the plaintiff has failed to heed Judge Amon's instructions concerning the pleading of fraud with particularity, and moreover has exceeded the scope of his leave of Court by now asserting a FLSA claim in the amended complaint, and by seeking to add HAGH as a defendant to this action.

## BACKGROUND

The following facts are set forth in plaintiff's amended complaint, and therefore are accepted as true in analyzing the defendants' motion to dismiss.

Defendant Sam is the plaintiff's nephew and for a period of time prior to March 1990 resided as a guest in the plaintiff's home. Amended Complaint ¶ 7. In or about April 1989, Sam, who is a licensed pharmacist, proposed to plaintiff the purchase of a pharmacy in Manhattan for which plaintiff would contribute funds needed for the purchase price and working capital and would become a 49% owner in the corporation which acquired the pharmacy (HAGH); Sam meanwhile assured his uncle of a position within the pharmacy by reason of which he would be "set for life." *Id.* ¶ 8.

During the period between April 1989 and July 1990, Sam discussed with the plaintiff the prospect of purchasing various pharmacies. Ultimately, in July 1990, Sam and the plaintiff agreed in principle to the purchase of a pharmacy located at 369 First Avenue in Manhattan [the "Pharmacy"]. *Id.* ¶ 9.

In or about the first week of September 1990, Sam represented to plaintiff that (i) a closing of the purchase of the Pharmacy would take place on September 7, 1990, (ii) title to the Pharmacy would be taken in the name of HAGH, (iii) 49% of the outstanding share capital of HAGH had been issued to

plaintiff, while the remaining 51% of the outstanding share capital had been issued to Sam, and (iv) plaintiff was required to attend the closing of the purchase of the Pharmacy and to bring with him the sum of $45,250. *Id.* ¶ 10.

In reliance upon Sam's representations, plaintiff attended the closing on September 7, 1990 and delivered to Sam a bank cashiers' check for $45,250 payable to the order of Sam, which Sam then indorsed to the order of 371 First Avenue Corporation. *Id.* ¶ 11. Thereupon, title to the Pharmacy was transferred to HAGH. At the closing, Sam also instructed the plaintiff to deliver an additional sum of $30,000 to him on or before September 10, 1990. *Id.* ¶ 12.

In reliance upon Sam's representations, plaintiff, on or about September 10, 1990, withdrew the sum of $30,000 from his Insured Market Rate Account at Citibank and deposited that sum in Sam's checking account at Citibank, Account No. 70979568. On September 13, 1990, Sam issued a check in the amount of $23,782.50 to Hasan Chaudrey drawn on this account in payment of a portion of the purchase price for the Pharmacy. *Id.* ¶ 13.

After the closing, plaintiff repeatedly inquired of Sam about receiving a certificate for shares representing a 49% interest in HAGH. On each occasion, Sam assured the plaintiff that the certificate for his 49% interest in HAGH was forthcoming but that it takes between six months and a year for the papers to be issued out of Albany. In early 1991, Sam delivered to the plaintiff a blank check that Sam had signed, drawn on account number 70979568 at Citibank, and stated to plaintiff that this check would guarantee the issuance to plaintiff of his shares in HAGH and the repayment to plaintiff of any loans made by plaintiff to Sam. *Id.* ¶ 14.

In reliance upon Sam's representations, plaintiff agreed to await the delivery of the certificate representing his 49% interest in HAGH and, on three separate occasions, in September and October of 1990, made cash loans to Sam aggregating $7,000. In addition, at Sam's request, plaintiff used the cash flow generated by his separate jewelry business to pay the salary of Alex, Sam's brother, in the aggregate amount of $8,750, for Alex's work in the Pharmacy from September 15, 1990 through January 15, 1991. *Id.* ¶ 16.

In or about January 1991, Sam asked the plaintiff if he could work for HAGH. Sam stated to plaintiff that HAGH's business required the supervision of a principal over clerks, stock persons, and cashiers, and needed the presence of a principal on Saturdays, when Sam's brother Alex took a day off, and on Sundays, when Sam took a day off. Sam stated to plaintiff that he would be paid for his services compensation that would reflect his status as a principal of HAGH. *Id.* ¶ 16.

On or about February 1, 1991, plaintiff commenced work for HAGH and continued in such employment for approximately sixty hours per week until about January 31, 1992, and for approximately thirty-six hours per week thereafter until about January 15, 1993. During this time, plaintiff received no compensation for his services. *Id.* ¶ 17. Rather, whenever plaintiff requested compensation, Sam told him that compensation could not be drawn because cash flow had to be dedicated to the purchase and maintenance of inventory. *Id.* ¶ 18.

On or about January 15, 1993, plaintiff confronted Sam concerning Sam's failure to compensate him for his services and to repay his loans in view of the Pharmacy's prosperity. Plaintiff also demanded receipt of his share certificate. In response to these requests, Sam told the plaintiff that the Pharmacy would not pay him for his services, or repay his loans, and that the plaintiff was not a shareholder of HAGH, and lacked any interest therein. Sam further told the plaintiff that he should no longer come to work for the Pharmacy. *Id.* ¶ 19. Plaintiff's subsequent demands for payment, including his proportionate share of HAGH's profits, likewise were refused by Sam. *Id.* ¶ 20.

On March 19, 1993, plaintiff brought suit in the United States District Court for the Eastern District of New York asserting the following claims: (1) common-law fraud; (2) rescission; (3) negligent misrepresentation; (4) federal securities fraud; (5) violations of the federal racketeering statute (RICO); (6) unlawful practices under the New York Gen-

eral Business Law; (7) violations of New York State's racketeering statute; (8) a request for declaratory relief; and (9) a request for an accounting. Upon oral argument before Judge Amon, the original complaint was dismissed by Order dated December 3, 1993 for failure to plead fraud with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure. The Order also granted plaintiff "leave to amend the complaint by pleading facts underlying the alleged fraud with sufficient particularity to satisfy the requirements of Rule 9(b)," and further authorized the plaintiff to substitute counsel if he so elected. Order at 1 (docket entry # 17). Subsequent to this Order, new counsel was procured and an amended complaint was filed.

The amended complaint differs from the original complaint in a number of respects. First, the amended complaint names HAGH as a codefendant to this action; the original complaint did not name HAGH as a party defendant. Second, the amended complaint asserts the following claims: (1) common-law fraud against Sam; (2) federal securities fraud against both Sam and HAGH; (3) breach of contract against Sam; (4) breach of contract against HAGH; (5) a violation of the Fair Labor Standards Act against HAGH; and (6) a cause of action under civil RICO against both Sam and HAGH. Third, the amended complaint adds new factual allegations concerning the details of the alleged fraud and the claim for nonpayment of wages, and deletes several factual allegations from the original complaint that had pertained to the valuation of HAGH's assets.

## DISCUSSION

### I. Plaintiff's Cross–Motion to Add HAGH as a Defendant

 Recognizing his failure to obtain leave of Court prior to naming HAGH as a codefendant in the amended complaint, the plaintiff has cross-moved to add HAGH as a party defendant retroactive to January 21, 1994, the date that the summons directed to HAGH in connection with the service of the amended complaint was filed with the Clerk of this Court. HAGH opposes this cross-motion on the ground that the plaintiff failed to procure a court order prior to service.

Rule 21 authorizes a federal district court to add parties "on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed. R.Civ.P. 21. In the instant action, a retroactive joinder of HAGH effective upon its receipt of service would promote a merit-based resolution of the entire controversy between the parties, and would cause HAGH no prejudice because it ostensibly has been aware of this lawsuit, through Sam, since the commencement of the action. In addition, resolution of the claims against Sam will not be delayed insofar as discovery has not yet commenced. Accordingly, plaintiff's cross-motion to add HAGH as a party defendant is granted.

### II. Defendants' Motion to Dismiss the Amended Complaint

#### A. Fed.R.Civ.P. 9(b): Pleading Fraud with Particularity

The defendants contend that this action should be dismissed because the plaintiff has failed to plead his allegations of fraud with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. It was upon this ground that Judge Amon predicated her dismissal of the original complaint with leave to replead.

Rule 9(b) of the Federal Rules of Civil Procedure provides an exception to the general rule governing pleadings set forth in Fed.R.Civ.P. 8. In contrast to the liberal policy of Rule 8 which simply requires the pleading to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a), Rule 9(b) provides as follows:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

Fed.R.Civ.P. 9(b). Thus Rule 9(b) constitutes an exception to the general approach of the federal rules that assigns to the pleadings the limited function of providing sum-

mary notice to the other party of the event being sued upon, and entrusts the disclosure of facts to discovery. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1202, at 69, 76 (2d ed. 1990). This exception for fraud serves the twofold purposes of "safeguard[ing] potential defendants from lightly made claims charging commission of acts that involve some degree of moral turpitude," and assisting the defendant in preparing an answer to the allegation. *Id.* § 1296, at 577–78, 580. Nevertheless, Rule 9(b) should "be read in conjunction with Rule 8 [inasmuch as] a plaintiff is not required to prove his case in his complaint." *GLM Corp. v. Klein,* 684 F.Supp. 1242, 1247 (S.D.N.Y.1988) (citing *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)).

█ The "circumstances constituting fraud" that Rule 9(b) requires to be particularized refers to such matters "as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Wright & Miller, *supra,* § 1297, at 590. Mere conclusory allegations of fraud within a complaint that "fail to specify the time, place, speaker, and ... content of the alleged misrepresentations, lack the 'particulars' required by Rule 9(b)." *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986).

█ Upon review of the allegations of fraud within the amended complaint, the Court finds that the plaintiff has pled these matters with sufficient precision to apprise the defendants of the claims against them and the acts relied upon as constituting the fraud charged. The allegations within the amended complaint provide a running chronology of the alleged fraudulent scheme, Sam's representations in the furtherance thereof, and the financial instruments and transactions employed in the scheme's perpetration. Further, the failure of the amended complaint to reiterate each allegation set forth in the original complaint does not detract from the overall effectiveness of the notice provided; rather, any conflicting representations may be tested through discovery and addressed by the court on motion for summary judgment. Moreover, the amended complaint does not assert that any individuals other than Sam made fraudulent representations or promises to the plaintiff; therefore Sam is not left to guess as to what representations are attributed to him. Thus, for example, with respect to the predicate acts of mail fraud and wire fraud relevant to the plaintiff's RICO claim, the defendants are sufficiently informed of the nature of the communications, the speaker, and their approximate time and place, to allow them to prepare their answer without confusion or prejudice. *See* Amended Complaint ¶ 51; *infra* Discussion § B.4 (reproducing ¶ 51 in substantive analysis of RICO count). Accordingly, the defendants' motion to dismiss the plaintiff's common-law fraud, federal securities fraud, and RICO causes of action pursuant to Rule 9(b) is denied.

**B.** *Fed.R.Civ.P. 12(b)(6) Motion to Dismiss*

1. *Standards Governing Rule 12(b)(6) Motion to Dismiss*

█ A district court should grant a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *Id.,* 492 U.S. at 249, 109 S.Ct. at 2906; *see Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

2. *Rule 10b–5 Federal Securities Fraud Claims*

In addition to assailing the plaintiff's pleading of fraud with particularity, which has already been discussed, the defendants offer two arguments in support of their motion to dismiss plaintiff's Rule 10b–5 claims. First, the defendants argue that the plaintiff's securities fraud claims assert a mere breach of contract in connection with the

failure to issue stock, and therefore are not within the purview of the antifraud provisions of the federal securities laws.[1] Second, the defendants contend that the plaintiff's 10b–5 claims are barred by the statute of limitations.

■ With respect to the defendants' first contention, the Court disagrees with their narrow characterization of plaintiff's securities fraud claims insofar as the amended complaint unequivocally alleges that the defendants' failure to issue stock was in the furtherance of a scheme to appropriate from the plaintiff the monies that he had invested in HAGH. *See* Amended Complaint ¶ 24. According to the amended complaint, Sam, intending to rescind his commitment, promised the plaintiff that HAGH would issue him stock in exchange for his capital investment therein. This allegation clearly comes within the purview of Rule 10b–5. *See Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33, 36 (2d Cir.1986) (alleged fraud in connection with failure to issue stock of closely-held corporation pursuant to a purchase agreement). Indeed, "[a] person who has made material misrepresentations in inducing another to part with something of value for the purchase of a security may not escape liability under Rule 10b–5 simply by refusing to issue a written instrument evidencing the security." [2] *Id.; see also Luce*, 802 F.2d at 55 ("[M]aking a specific promise to perform a particular act in the future while secretly intending not to perform that act may violate Section 10(b) where the promise is part of

the consideration for the transfer of securities."). Thus, the plaintiff's federal securities fraud claims are cognizable under Rule 10b–5.

The defendants next argue that the plaintiff's Rule 10b–5 claims are barred by the statute of limitations. According to the defendants, the plaintiff should have become aware of the possibility of fraud as early as September 1991 in view of his failure to receive a stock certificate evidencing his ownership interest in HAGH notwithstanding Sam's prior representations suggesting that the plaintiff should have expected to receive the stock certificates by that time. The defendants contend that the federal securities fraud claims therefore should have been brought one year later, that is, by September 1992.[3]

■ The Supreme Court has held that "[l]itigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation *and* within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991) (emphasis added).[4] The three-year period of repose from the date of violation serves as a definitive cutoff for bringing a 10b–5 claim; no equitable tolling of this period is permitted. *See id.* Further, the one-year prong of this statute of limitations may be triggered through constructive or inquiry notice, as well as

---

1. To state a claim under section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, "a complaint must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security." *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

2. An alternative analysis to bring plaintiff's claims under the federal securities laws would be to view Sam, in connection with his representations to the plaintiff concerning the purchase of a 49% equity interest in HAGH, to have "omit[ted] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b–5(b). In this case, the material fact that Sam allegedly

omitted is that he did not intend to issue stock to the plaintiff.

3. This action was commenced against Sam on March 19, 1993. The amended complaint, which named HAGH as a party defendant for the first time, was filed on January 21, 1994.

4. Congress has legislatively overruled *Lampf* to prevent its retroactive application to actions commenced on or before June 19, 1991. *See Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 80 (2d Cir.1993). Since the present action was commenced in 1993, the limitations period articulated in *Lampf* properly applies to this case. *See also Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 364 (2d Cir.1990) (adopting the one-year/three-year limitations period for the Second Circuit, later made applicable to the entire country by the Supreme Court in *Lampf*).

through actual notice. *See Menowitz v. Brown*, 991 F.2d 36, 41–42 (2d Cir.1993). The plaintiff need not actually learn of the possibility of fraud to trigger the one-year limitations period; rather, the one-year prong becomes operative upon the date in which the plaintiff is placed on notice of those facts " 'which in the exercise of reasonable diligence, would have led to actual knowledge' " of the possibility of fraud. *Id.* (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992)). The running of the earlier of the one-year and three-year prongs extinguishes a plaintiff's 10b–5 claim.

▪■ In the instant case, the Court regards Sam's repudiation of the prior agreement for the purchase of stock, which occurred on or about January 15, 1993, to be the triggering event for the commencement of the statute of limitations. To hold otherwise in the context of a closely-held corporation would allow a perpetrator of fraud to insulate himself from liability under Rule 10b–5 by accepting consideration for stock with the intent of never issuing it, making continuing representations to mitigate suspicion, and finally repudiating the stock-purchase agreement on its third anniversary. While the Court recognizes that in the typical commercial context where the parties are dealing at arms length, events could arise prior to repudiation (e.g., failure to issue stock certificates) to place the aggrieved party on inquiry notice of fraud (thus triggering the one-year prong of the statute of limitations),[5] where the determination of whether there exists a reasonable suspicion of fraud is colored by a family relationship and the heightened degree of trust that it may imbue,[6] the procedural posture indicates against concluding inquiry notice of fraud on a Rule 12(b)(6) motion to dismiss. *Cf. In re Ames Dep't Stores, Inc. Note Litig.*, 991 F.2d

968, 980 (2d Cir.1993) (genuine issue of fact concerning notice of fraud precluded summary judgment).

Employing January 15, 1993 as the date of violation, the plaintiff's Rule 10b–5 claim against Sam comes within both the one-year and three-year limitation periods. The 10b–5 claim against HAGH fails, however, under the one-year limitations prong because the plaintiff admits to knowledge of the alleged fraud, on or about January 15, 1993, *see* Amended Complaint ¶ 19, but did not serve the amended complaint upon HAGH until January 21, 1994—more than one year later. Accordingly, Sam's motion to dismiss the federal securities fraud count pursuant to Rule 12(b)(6) is denied, while HAGH's motion is granted.

### 3. *Fair Labor Standards Act [FLSA] Claim*

Defendant HAGH moves to dismiss plaintiff's FLSA claim, which seeks to recover minimum wage pay for regular hours, as well as overtime pay, liquidated damages, and attorney's fees. In this claim, the plaintiff alleges that in response to Sam's request that he work in the business of HAGH as a principal, he was employed without compensation from approximately February 1, 1991 through January 15, 1993. *See* Amended Complaint ¶¶ 16–19, 40–41. HAGH argues that this claim must be dismissed; according to HAGH, the plaintiff—in view of (i) his allegation that he was a signatory, as officer of the corporation, on HAGH's corporate bank account at Citibank, *see* Amended Complaint ¶ 51(c), and (ii) his belief that he was a 49% shareholder of HAGH and would be compensated for his work accordingly—either was not an employee within the meaning of the FLSA, or if an employee, was exempted from coverage under the FLSA as a

---

**5.** In stark contrast to the circumstances of the instant case, in *Menowitz*, inquiry notice was found to exist with respect to alleged misrepresentations contained in a prospectus and various other SEC-mandated disclosure documents, including an annual 10–K report and several 10–Q reports, that the plaintiffs relied upon in their complaints. These SEC-mandated documents disclosed the existence of over eighty lawsuits against the corporation in question and certain of the companies' officers, as well as civil and

criminal investigations, concerning allegedly improper and fraudulent sales practices. *See Menowitz*, 991 F.2d at 38, 42.

**6.** The plaintiff's actual reliance upon Sam's continuing assurances is suggested through the plaintiff's continued employment with HAGH until the date that Sam repudiated the stock purchase agreement.

principal employed in either an administrative or executive capacity. HAGH further argues that even if the plaintiff were entitled to protection under the FLSA, much of the relief he requests would be barred by the statute of limitations.[7]

■ Section 13(a)(1) of the FLSA, 29 U.S.C. § 213(a)(1), exempts from the minimum wage and maximum hours provisions of the Act workers "employed in a bona fide executive, administrative, or professional capacity," as those terms are "defined and delimited from time to time by regulations of the Secretary." 29 U.S.C. § 213(a)(1); *see Reich v. State of New York,* 3 F.3d 581, 587 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1187, 127 L.Ed.2d 537 (1994). The putative employer—HAGH in this case—bears the burden of proving that the plaintiff's duties place him within an exemption to coverage. *See Reich,* 3 F.3d at 586. In view of the Act's remedial purposes, the FLSA exemptions are not expansively construed. *See id.*

■ The regulations to the FLSA make clear that representations made by an employer prior to an individual's commencement of employment are not dispositive to the determination of whether such individual is employed in an executive or administrative capacity. *See* 29 C.F.R. § 541.201(b)(1), (2). Rather, noting the insufficiency of titles as yardsticks, the regulations require "the exempt or nonexempt status of any particular employee [to] be determined on the basis of whether his duties, responsibilities and salary meet all the requirements of the appropriate section of the regulations...." 29 C.F.R. § 541.201(b)(2). Further, consistent with the fact-intensive nature of the inquiry, an employee's ownership interest in the enterprise by which he is employed will not automatically negate an employee's coverage under the Act. *See* 29 C.F.R. § 541.114.

29 C.F.R. § 541.1 establishes six specific criteria, all of which must be met (except for the fifth criterion in the case of an employee who owns more than a 20% interest in the employer), before an employee who earns less than $250 per week[8] may be exempted from coverage under the FLSA as an "executive" employee. The regulations provide as follows:

The term *employee employed in a bona fide executive ... capacity* in section 13(a)(1) of the Act shall mean any employee:

(a) Whose primary duty consists of the management of the enterprise in which he is employed ...; and

(b) Who customarily and regularly directs the work of two or more other employees therein; and

(c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

(d) Who customarily and regularly exercises discretionary powers; and

(e) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d) of this section ...; and

(f) Who is compensated for his services on a salary basis at a rate of not less than $155 per week ... exclusive of board, lodging, or other facilities: *Provided,* That an employee who is compensated on a salary basis at a rate of no less than $250 per

7. As an aside, in response to an additional argument raised by HAGH, the Court notes *Pedreyra v. Cornell Prescription Pharmacies, Inc.,* 465 F.Supp. 936, 942 (D.Colo.1979) (drugstore was an employer subject to the FLSA where its employees regularly handled drugs that were shipped from interstate enterprises), for the proposition that the operation of the pharmacy in question may generate a sufficient nexus to

interstate commerce to trigger invocation of the FLSA.

8. In the case of an employee who is employed by other than the federal government in Puerto Rico, the Virgin Islands or American Samoa, the applicable amount is $200 per week. *See* 29 C.F.R. § 541.1(f).

week ... exclusive of board, lodging, or other facilities, and whose primary duty consists of the management of the enterprise in which the employee is employed ... and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.1 (emphasis in original).

29 C.F.R. § 541.2 establishes five specific criteria, all of which must be met, before an employee who earns less than $250 per week[9] may be exempted from coverage under the FLSA as an "administrative" employee. The regulations provide:

> The term *employee employed in a bona fide ... administrative ... capacity* in section 13(a)(1) of the Act shall mean any employee:

> (a) Whose primary duty consists of either:

> (1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers, or

> (2) The performance of functions in the administration of a school system, or educational establishment or institution ...; and

> (b) Who customarily and regularly exercises discretion and independent judgment; and

> (c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity ..., or

> (2) Who performs under only general supervision work along specialized or technical lines, requiring special training, experience, or knowledge, or

> (3) Who executes under only general supervision special assignments and tasks; and

> (d) Who does not devote more than 20 percent, or, in the case of an employee of a retail or service establishment who does not devote as much as 40 percent, of his

hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

> (e)(1) Who is compensated for his services on a salary or fee basis at a rate of not less than $155 per week ... exclusive of board, lodging, or other facilities, or

> (2) Who, in the case of academic administrative personnel, is compensated for services as required by paragraph (e)(1) of this section ... *Provided,* That an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week ... exclusive of board, lodging, or other facilities, and whose primary duty consists of the performance of work described in paragraph (a) of this section, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all the requirements of this section.

29 C.F.R. § 541.2 (emphasis in original).

As adverted above, in analyzing whether an employee comes within the exemption for executives, the above requirements are modified to some extent in the case of an employee who owns more than a 20% interest, including an interest as a shareholder, in the employer's enterprise. Recognizing "the special status of a shareholder of an enterprise who is actively engaged in its management," the regulations provide "an exception from the percentage limitations on nonexempt work ... for an employee who owns at least a 20–percent interest in the enterprise in which he is employed." 29 C.F.R. § 541.114(a).

Turning to the instant case, notwithstanding the plaintiff's concession within his amended complaint that Sam represented to him that he would come to work for HAGH as a principal, the Court concludes that the amended complaint's allegations concerning the plaintiff's actual duties of employment do not come within either the administrative or executive exemptions to the FLSA. Simply

---

9. Once again, in the case of an employee who is employed by other than the federal government in Puerto Rico, the Virgin Islands or American Samoa, the applicable amount is $200 per week. *See* 29 C.F.R. § 541.2(e)(2).

stated, plaintiff's allegations, if true—as must be accepted on a motion to dismiss—portray his duties as clerical, and lacking in actual supervisory and discretionary authority in relation to the enterprise. While his asserted 49% ownership interest in the enterprise indeed may have affected the terms of his employment, the regulations acknowledge that in the case of a closely-held corporation, the dynamics of control could subjugate a minority shareholder to the majority shareholder's direction, leaving him with little real authority to act on behalf of the corporation. *Cf.* 29 C.F.R. § 541.114 (noting premise of active management underlying exception from the percentage limitations on nonexempt work for an employee "who owns at least a 20–percent interest in the enterprise in which he is employed"); *see also Reich,* 3 F.3d at 586 (The "regulations mandate a fact-intensive inquiry into the 'primary duties' of the employee[ ] at issue."). Further, in the event that the defendants are successful at trial in proving that the plaintiff never acquired any ownership interest in the corporation, HAGH's argument that the plaintiff, despite not receiving any compensation for his services, exercised discretionary authority as though he were a principal, would be mooted. Accordingly, the Court is unable substantively to resolve this claim against the plaintiff on a Rule 12(b)(6) motion to dismiss.

■ HAGH next argues that a considerable portion of the alleged unpaid wages are time barred under the statute of limitations. Under 29 U.S.C. § 255(a), a cause of action under the FLSA ordinarily must "be commenced within two years after the cause of action accrued;" the statute of limitations is extended to three years, however, where the cause of action arises "out of a willful violation" of the Act. 29 U.S.C. § 255(a). To establish a "willful violation" of the FLSA, the employee must prove "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). Generally, "a cause of action under the [FLSA] for unpaid minimum wages or unpaid overtime compensation and for liquidated damages 'accrues' when the employer

fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends." 29 C.F.R. § 790.21(b). The plaintiff further contends, citing caselaw from other circuits, that the statute of limitations may be equitably tolled where an employer misrepresents to an employee that compensation for services will be forthcoming at a later date.

Without reaching the question of the availability of equitable tolling under the FLSA, the Court finds that the plaintiff, through his allegations in the amended complaint that portray a reckless disregard by HAGH of the plaintiff's statutory rights, has adequately alleged a willful violation of the FLSA to permit the three-year limitations period to apply for purposes of the instant motion to dismiss. *See* Amended Complaint ¶¶ 16–19; *McLaughlin,* 486 U.S. at 133, 108 S.Ct. at 1681; *see also* Fed.R.Civ.P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred *generally.*") (emphasis added). Insofar as plaintiff alleges that he commenced employment with HAGH on or about February 1, 1991, and the amended complaint was filed on January 21, 1994, the entirety of the FLSA claim comes within the statute of limitations. Accordingly, HAGH's motion to dismiss the FLSA claim must be denied.

### 4. *RICO Claims*

Finally, both Sam and HAGH move to dismiss the RICO count asserted against them. First, they contend that the RICO predicate acts of wire fraud and mail fraud alleged in the amended complaint continue to suffer from the absence of particularity that resulted in the dismissal of the original complaint pursuant to Fed.R.Civ.P. 9(b). Second, the defendants argue that the plaintiff fails to plead a "pattern of racketeering activity" requisite to sustain a RICO claim. With respect to this point, the defendants assert that RICO is not triggered by the plaintiff's claim that he was repeatedly defrauded by his nephew, over a period of approximately 29 months, in connection with the pharmacy in question, insofar as the plaintiff's allegations fail to establish a threat of future activity or any repeated conduct. According to

the defendants, RICO is not implicated where a complaint alleges a single closed-ended scheme involving one perpetrator, one victim, a closely-held corporation, and transactions that resound predominately of breach of contract and fraud. Since the Court has already addressed, and rejected, within this Memorandum and Order the defendants' contentions regarding the pleading of fraud with particularity, the Court will now turn its attention to the substantive nature of the plaintiff's RICO allegations.

In Count Six of his amended complaint, in alleging a RICO violation, and specifically, violations of 18 U.S.C. § 1962(b), (c) and (d), *see* Amended Complaint ¶¶ 52–54, plaintiff asserts that "Sam engaged in racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B), including the federal offenses of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and fraud in the offer and sale of securities in violation of 15 U.S.C. § 78j(b) and [Rule 10b–5 promulgated thereunder]." Amended Complaint ¶ 48. Plaintiff alleges that Sam is a "person" within the meaning of 18 U.S.C. § 1961(3), while HAGH is an "enterprise" within the meaning of 18 U.S.C. § 1961(4). Amended Complaint ¶¶ 49–50. Plaintiff further alleges that "Sam engaged in the following predicate acts of racketeering activity in the organization and conduct of HAGH to defraud Plaintiff by false and fraudulent pretenses, representations and promises:"

(a) Sam fraudulently schemed to solicit and did solicit Plaintiff, over the telephone and by means of interstate commerce, to invest in the common stock of HAGH, to lend money to HAGH and to Sam for use in the business of HAGH, and to work for HAGH.

(b) From in or about August of 1990, until January of 1993, on multiple occasions Sam falsely represented to Plaintiff over the telephone and by means of interstate commerce that Plaintiff was a 49% shareholder of HAGH; that the share certificate evidencing Plaintiff's interest in HAGH was to be issued by Albany and would be forthcoming shortly; that Sam would repay to Plaintiff the sum of $7,000 loaned by Plaintiff to Sam in September and October of

1990 for use in the business of HAGH; that HAGH would repay to Plaintiff the sum of $8,750 paid by Plaintiff to Alex on behalf of HAGH between September, 1990 and January, 1991; and that HAGH would pay to Plaintiff wages for his services to HAGH between February 1991 and January 1993.

(c) In furtherance of the scheme to defraud Plaintiff, in or about June 1991, Sam, through communication over the telephone and by means of interstate commerce, arranged for Plaintiff to become a signatory on the bank account of HAGH at Citibank and to be listed with Citibank as an officer of HAGH for the sole purpose of deceiving Plaintiff to believe that Plaintiff was a shareholder and principal of HAGH, although Sam had no intention of issuing shares of HAGH common stock to Plaintiff or paying Plaintiff for funds advanced to Sam and HAGH or services rendered to HAGH.

(d) In furtherance of the scheme to defraud Plaintiff, in 1991 Sam gave to Plaintiff a signed blank check for the purpose of assuring Plaintiff that he was a shareholder of HAGH although, on information and belief, the check was drawn on a bank account that never had in it funds sufficient to repay to Plaintiff any of the amounts invested or advanced by him.

*Id.* ¶ 51. Plaintiff moreover alleges that the foregoing predicate acts, in tandem with Sam's use of the mails in the furtherance of the fraudulent scheme, *see id.* ¶ 55, constitute a pattern of racketeering on the part of Sam in the conduct of HAGH insofar as Sam allegedly used the funds and services fraudulently obtained from the Plaintiff for the purchase and operation of the Pharmacy by HAGH. *See id.* ¶¶ 52, 53.

"RICO renders criminally and civilly liable 'any person' [a] who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, [18 U.S.C.] § 1962(a); [b] who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering activity,' § 1962(b); [c] who, being employed by or associated with such an enterprise,

conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' § 1962(c); or, finally, [d] who conspires to violate [any of] the first three subsections of [18 U.S.C.] § 1962, § 1962(d)." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232–33, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989); *see Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir.1994) ("To establish a civil RICO claim for violation of § 1962(c), a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.") (internal quotes omitted). "RICO provides for drastic remedies: conviction for a violation of RICO carries severe criminal penalties and forfeiture of illegal proceeds, 18 U.S.C. § 1963 ... and a person found in a private civil action to have violated RICO is liable for treble damages, costs, and attorney's fees, 18 U.S.C. § 1964(c)." *H.J. Inc.,* 492 U.S. at 233, 109 S.Ct. at 2897.

In the instant case, the plaintiff sues Sam and HAGH under RICO for violating 18 U.S.C. § 1962(b), (c) and (d). *See* Amended Complaint ¶¶ 52–54. The plaintiff does not assert any violations of § 1962(a).[10]

The primary substantive RICO issue debated by the parties is whether the plaintiff's amended complaint adequately pleads a "pattern of racketeering activity." "In order to show such a pattern, a plaintiff must show at least two predicate acts committed in a 10–year period." *Azrielli,* 21 F.3d at 520 (citations omitted); *see* 18 U.S.C. § 1961(5) (" '[P]attern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [the RICO statute] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."). For purposes of RICO, a predicate act is defined to mean any of the acts listed in 18 U.S.C. § 1961(1). Pertinent to the instant action, the enumerated predicate acts include any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud) or 18 U.S.C.

§ 1343 (relating to wire fraud), and "fraud in the sale of securities." 18 U.S.C. § 1961(1).

To constitute a pattern, the RICO predicate acts (1) must be related, and (2) reveal (a) continued, or (b) the threat of continued, unlawful conduct. *See Azrielli,* 21 F.3d at 520. As the Supreme Court has explained:

> A pattern is not formed by sporadic activity, ... and a person cannot be subjected to the sanctions of [RICO] simply for committing two widely separated and isolated criminal offenses.... Instead, the term "pattern" itself requires the showing of a relationship between the predicates, ... and of the threat of continuing activity.... It is this factor of *continuity plus relationship* which combines to produce a pattern....

*H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900 (emphasis in original) (internal quotes omitted); *Azrielli,* 21 F.3d at 520 (quoting *H.J. Inc.,* 492 U.S. at 239, 109 S.Ct. at 2900). "The purpose of the relationship and continuity requirements is to 'prevent the application of RICO to the perpetrators of isolated or sporadic criminal acts.' " *Azrielli,* 21 F.3d at 520 (quoting *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989) (en banc)). However, multiple schemes are not required in order for a pattern to be found, and further, there is no requirement that the predicate acts be discernable as separable episodes or transactions. *See Indelicato,* 865 F.2d at 1383–85 (Nearly simultaneous assassinations of three persons to effect a change in leadership of an organized crime family constituted three separate acts of racketeering activity and was sufficient to establish the basis for a pattern; it was not necessary, analytically, to regard these three acts as one.).

Relatedness may be established by proof of "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901. The Second Circuit has noted that

---

**10.** As will be discussed, the omission of § 1962(a) is significant with respect to plaintiff's

putative attempt to assert a RICO claim against HAGH.

[a]n interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions. The degree to which these factors establish a pattern may depend on the degree of proximity, or any similarities in goals or methodology, or the number of repetitions.

*Azrielli,* 21 F.3d at 520 (quoting *Indelicato,* 865 F.2d at 1382). Further, in order for the relatedness element to be satisfied, the predicate acts must be related, directly or indirectly, to each other as well as to the enterprise. *See United States v. Locascio,* 6 F.3d 924, 943 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994); *United States v. Long,* 917 F.2d 691, 697 (2d Cir.1990).

Continuity—the second element that must be shown in order for a pattern of racketeering activity to be established—is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.,* 492 U.S. at 241, 109 S.Ct. at 2902. It thus may be proved in a variety of ways. "For example, 'a party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.'" *Azrielli,* 21 F.3d at 521 (quoting *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902). "Alternatively, the continuity requirement may be met by demonstrating a threat of continuity, for example, by showing that the defendant operates as part of a long-term association that exists for criminal purposes, or that the predicates are a 'regular way of conducting defendant's ongoing legitimate business.'" *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. at 2902).

 Applying these standards to the case at bar, the Court finds that the plaintiff has adequately pled a "pattern of racketeering activity," and that therefore Sam's motion to dismiss the RICO count within the amended complaint must be denied. Unlike the facts presented in the cases cited by the defendants, the instant action does not present a mere breach-of-contract claim involving a "single transaction gone sour" that fails to give rise to a pattern. *Passini v. Falke–Gruppe,* 745 F.Supp. 991, 993 (S.D.N.Y.1990). Rather, the plaintiff in the case at bar claims that he invested $75,250 for a 49% ownership interest in a corporation in reliance upon fraudulent representations made to him by Sam, his nephew, in August and September 1990. According to the amended complaint, during the course of the next twenty-nine months, Sam made a series of additional fraudulent representations, through the mails and over the telephone, and by means of interstate commerce, which were designed to defuse his uncle's suspicions, and to induce his uncle to lend additional monies to the corporation, and to work for the corporation without compensation, under the belief that he was a 49% shareholder therein. Accepting the allegations of the amended complaint as true, it is clear to the Court that the requirement of relatedness is satisfied insofar as the predicate acts display a commonality in purpose, participant, and victim, *see H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901, and are substantial in number. *See Azrielli,* 21 F.3d at 520 (Repetition of predicate acts is among the factors to be considered in evaluating relatedness.) (quoting *Indelicato,* 865 F.2d at 1382).

The requirement of continuity likewise is satisfied. The amended complaint pleads a closed-ended scheme involving a series of RICO predicate acts that spanned approximately twenty-nine months, commencing in August 1990 with Sam's representations to the plaintiff concerning the 49% interest that the plaintiff would acquire in HAGH, *see* Amended Complaint ¶ 10, and continuing through January 1993 when Sam declared void the plaintiff's equity interest in the corporation, *see id.* ¶ 19. Considering the nature and frequency of the predicate acts that have been pled, the Court regards this duration to be sufficient to satisfy the continuity requirement in establishing a pattern of racketeering activity. *See Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir.1992) (Continuity element satisfied where the related predicate acts spanned approximately

twenty-four months.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

Further, the defendants' argument that a pattern of racketeering activity cannot exist where a complaint alleges but a single victim to a closed-ended scheme lacks support both in RICO's legislative history and under the law of the Second Circuit. The defendants fail to bring to the Court's attention any legislative materials to suggest that Congress intended to exempt closed-ended conduct injuring a single victim from RICO's expansive scope. Indeed, in commenting on Congress's intent in enacting RICO and the scope of the conduct that the statute proscribes, the Supreme Court expressly rejected a statutory construction amenable to a bright-line rule that would limit RICO's applicability to a particular species of fact:

> 18 U.S.C. § 1961(1) . . ., with its very generous definition of "racketeering activity," acknowledges the breakdown of the traditional conception of organized crime, and responds to a new situation in which persons engaged in long-term criminal activity often operate *wholly* within legitimate enterprises. Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways.

*H.J. Inc.,* 492 U.S. at 248–49, 109 S.Ct. at 2905 (emphasis in original). Moreover, the Second Circuit has suggested that where the relatedness and continuity elements are satisfied, the confinement of fraudulent acts to a single victim or plaintiff does not insulate the actor from RICO liability. *Cf. Metromedia Co.,* 983 F.2d at 355, 369 (Pattern of racketeering activity found to exist in civil action brought by purchaser of 80% interest in closely-held corporation where the related

predicate acts spanned approximately two years.).[11] Thus, for example, in *Jacobson v. Cooper,* 882 F.2d 717 (2d Cir.1989), the Second Circuit found a "pattern of racketeering activity" to exist where the complaint principally asserted that two codefendants wrongfully failed to account for the income and proceeds derived through their management and sale of certain real property, constituting an enterprise, with which they had been entrusted by the plaintiff.[12] The Second Circuit found relatedness to be present because the predicate acts "had the supposed purpose and effect of depriving [the plaintiff] of interests in his real estate enterprise, involved the same 'participants, victim, and methods of commission, and [were] not isolated events.'" *Jacobson,* 882 F.2d at 720 (quoting *H.J. Inc.,* 492 U.S. at 239–41, 109 S.Ct. at 2901). Continuity likewise existed because the "'related predicates extended over a substantial period of time . . . .'" *Id.* (quoting *H.J. Inc.,* at 241–43, 109 S.Ct. at 2902).

Finally, with respect to the RICO claim against HAGH, the Court notes that a RICO enterprise generally may not be held liable under 18 U.S.C. § 1962(b) or (c), because for purposes of these subsections, a defendant may not be both a "person" and an "enterprise." *See Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 668 (2d Cir.1989). It therefore follows—if only as a matter of pleading—that a cause of action under 18 U.S.C. § 1962(d), that asserts a conspiracy to violate 18 U.S.C. § 1962(b) or (c), preserves this person-enterprise dichotomy. This limitation does not apply, however, to causes of action under 18 U.S.C. § 1962(a), which makes it unlawful for "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the pro-

11. The Court notes that in *Metromedia Co.,* one of the predicate acts asserted was a "bankruptcy fraud," that presumably would have injured not only the plaintiff, but rather, all of the general creditors of the enterprise in bankruptcy. *See Metromedia Co.,* 983 F.2d at 369.

12. The Court notes that the Second Circuit's opinion in *Jacobson* indicates two additional "RICO victims" besides the plaintiff in that case, each of whom ostensibly was a related party, or

nominee, with respect to the plaintiff: (i) the plaintiff's former wife, from whom defendant Cooper borrowed money to purchase or convert into a cooperative apartment building one of the properties in which the plaintiff claimed an interest, and (ii) the plaintiff's son (who was also named as one of the two codefendants), whose nominal interests in the plaintiff's properties were foreclosed upon by defendant Cooper. *See Jacobson,* 882 F.2d at 718.

ceeds of such income, in ... the ... operation of, any enterprise which is engaged in ... interstate ... commerce." 18 U.S.C. § 1962(a). "Thus, under § 1962(a), it may be possible for a defendant to also be the enterprise." *Official Publications,* 884 F.2d at 668.

In the amended complaint, the plaintiff does not plead a RICO claim under 18 U.S.C. § 1962(a); instead, he bases his RICO claim solely upon § 1962(b), (c) and (d), which as discussed above, do not permit HAGH to serve as both a RICO person and a RICO enterprise. Further, there is no allegation within the pleadings to suggest that the plaintiff seeks to impose liability on HAGH on the basis of *respondeat superior.*[13] Indeed, the naming of HAGH as a RICO codefendant within the demand-of-judgment section of the amended complaint strikes the Court as an oversight in pleading, in view of the amended complaint's substantive RICO allegations which place culpability entirely upon Sam. Accordingly, to the extent that the amended complaint purports to assert a RICO claim against HAGH, such claim must be dismissed, both for lack of a substantive basis, and independently, for failure to be well-pleaded. Leave to replead this claim, however, will be allowed.

### CONCLUSION

In accordance with the foregoing, the Court enters the following orders in this action:

(1) Plaintiff's cross-motion to add HAGH Prescription Headquarters, Inc. as a party defendant is GRANTED. Fed.R.Civ.P. 21.

(2) Sam's motion to dismiss plaintiff's federal securities fraud claim is DENIED. Fed. R.Civ.P. 9(b), 12(b)(6).

(3) HAGH's motion to dismiss plaintiff's federal securities fraud claim is GRANTED. Fed.R.Civ.P. 12(b)(6).

(4) HAGH's motion to dismiss plaintiff's FLSA claim is DENIED. Fed.R.Civ.P. 12(b)(6).

(5) Sam's motion to dismiss plaintiff's RICO claim is DENIED. Fed.R.Civ.P. 9(b), 12(b)(6).

(6) HAGH's motion to dismiss plaintiff's RICO claim is GRANTED. Fed.R.Civ.P. 9(b), 12(b)(6). Plaintiff is granted leave to replead this claim within thirty days of the docketing of this Memorandum and Order. Fed.R.Civ.P. 15(a).

SO ORDERED.

---

**13.** As this issue is not before the Court, the Court expresses no opinion as to the viability of a *respondeat superior* basis for liability under RICO, or to what extent this theory is subsumed by the availability of enterprise liability under 18 U.S.C. § 1962(a). *Cf. Official Publications,* 884 F.2d at 668; *see generally* Paul A. Batista & Mark S. Rhodes, Civil RICO Practice Manual §§ 5.7, 5.12–5.15 (1987 & Supp.1995).